AO93 Search and Seizure Warrant

FILED ☒ RECEIVED ___
LODGED ___ COPY ___

JAN 2 3 2023

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY ___ DEPUTY

# UNITED STATES DISTRICT COURT
for the
District of Arizona

In the Matter of the Search of
4665 E County 12TH ST
Yuma, Arizona 85365 (32.65275, -114.55144)

Case No.   23-1131 MB

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of Arizona:

**As further described in Attachment A.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

**As set forth in Attachment B.**

**YOU ARE COMMANDED** to execute this warrant on or before   2/6/2023 *(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10:00 p.m. ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>any United States Magistrate Judge on criminal duty in the District of Arizona.</u>

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized ☐ for _30_ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: 1/23/2023 at 10:32am

_____
*Judge's signature*

City and state: <u>Yuma, Arizona</u>     <u>Honorable JAMES F. METCALF, U.S. Magistrate Judge</u>
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property is located at 4665 E County 12TH ST, Yuma, Arizona 85365 (32.65275, -114.55144). (hereinafter the "**Subject Premises**") further described as a single-story home and any vehicle found on the premises with a nexus to the property. The property has beige light-colored stucco walls. There are two entrances to the property, both hinged doors. The front entrance is located on the east side of the property. The back entrance located on the northwest side of the property.



**ATTACHMENT B**

*Property to be seized*

1.     Books, records, receipts, notes, ledgers, invoices, and any other documentation related to alien smuggling transactions and activities including, but not limited to, documentary records and ledgers, customer lists, financial statements, real estate documents, and other evidence of financial transactions relating to obtaining, transferring, secreting or spending various sums of money made from engaging in alien smuggling activities;

2.     Maps reflecting smuggling routes, foreign fuel receipts, receipts reflecting travel to and from foreign countries, receipts pertaining to the purchase and registration of vehicles, receipts for modifications and repairs done to vehicle, and receipts for the purchase of portable radios, cellular phones, pagers, and firearms;

3.     Records relating to the receipt, transportation, deposit, transfer, or distribution of money, including but not limited to, direct deposit confirmations, wire transfers, money orders, cashier's checks, check stubs, PayPal or other electronic money transfer services including, but not limited to, MoneyGram, Moneypak, Green Dot, and Vanilla Reload, check or money order purchase receipts, account statements – both foreign and domestic, and any other records reflecting the receipt, deposit, or transfer of money;

4.     United States currency, foreign currency, financial instruments, negotiable instruments, jewelry, precious metals, stocks, bonds, money wrappers, and receipts or documents regarding purchases of real or personal property;

5.     Vehicle rental agreements and receipts, storage facility rental agreements, records of mail services, airline ticket receipts, bus ticket receipts, credit card receipt, hotel receipts, travel agency vouchers, long distance telephone call records, and any other items reflecting domestic and foreign travel;

6.      Safe deposit box keys, storage locker keys, safes, and related secure storage devices, and documents relating to the rental or ownership of such units;

7.      Indicia of occupancy, residency, rental, ownership, or use of the Subject Premises and any vehicles found thereon during the execution of the warrant, including, utility and telephone bills, canceled envelopes, rental, purchase or lease agreements, identification documents, keys, records of real estate transactions, vehicle titles and registration, and vehicle maintenance records;

8.      Photographs, including still photos, negatives, slides, videotapes, and films, in particular those showing co-conspirators, criminal associates, U.S. currency, smuggled aliens, real and personal property, firearms, or controlled substances;

9.      Firearms, ammunition, magazines, cases, boxes, holsters, slings, gun pieces, gun cleaning items or kits, ammunition belts, original box packaging, targets, expended pieces of lead, and records, receipts, or other paperwork showing the purchase, storage, disposition, or dominion and control over firearms and ammunition.

10.     Electronic equipment, including cellular telephones, computers, disks, thumb drives, and any media storage device, GPS devices and their memory, and related manuals used to generate, transfer, count, record or store the information described in this attachment.

11.     Records evidencing ownership or use of cellular telephones, including sales receipts, pre-paid minute cards, registration records, and records for payment for internet access.

AO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| In the Matter of the Search of | |
|---|---|
| 4665 E County 12TH ST<br>Yuma, Arizona 85365 (32.65275, -114.55144) | Case No.  23-1131MB |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**As further described in Attachment A**

located in the District of Arizona, there is now concealed:

**As set forth in Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324(a)(1)(A)(iii) | Bringing In, Transporting and Harboring Illegal Aliens |

The application is based on these facts:

**See attached Affidavit of Border Patrol Agent Matthew M. Taynton**

☒ Continued on the attached sheet.

☐ Delayed notice of  30  days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA LeighAnn M. Thomas

_____
*Applicant's Signature*

Matthew M. Taynton, Border Patrol Agent
*Printed name and title*

Sworn to telephonically.

Date: _1/23/2023_

_____
*Judge's signature*

City and state: Yuma, Arizona

Honorable JAMES F. METCALF, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property is located at 4665 E County 12TH ST, Yuma, Arizona 85365 (32.65275, -114.55144). (hereinafter the "**Subject Premises**") further described as a single-story home and any vehicle found on the premises with a nexus to the property. The property has beige light-colored stucco walls. There are two entrances to the property, both hinged doors. The front entrance is located on the east side of the property. The back entrance located on the northwest side of the property.



## ATTACHMENT B

### *Property to be seized*

1.      Books, records, receipts, notes, ledgers, invoices, and any other documentation related to alien smuggling transactions and activities including, but not limited to, documentary records and ledgers, customer lists, financial statements, real estate documents, and other evidence of financial transactions relating to obtaining, transferring, secreting or spending various sums of money made from engaging in alien smuggling activities;

2.      Maps reflecting smuggling routes, foreign fuel receipts, receipts reflecting travel to and from foreign countries, receipts pertaining to the purchase and registration of vehicles, receipts for modifications and repairs done to vehicle, and receipts for the purchase of portable radios, cellular phones, pagers, and firearms;

3.      Records relating to the receipt, transportation, deposit, transfer, or distribution of money, including but not limited to, direct deposit confirmations, wire transfers, money orders, cashier's checks, check stubs, PayPal or other electronic money transfer services including, but not limited to, MoneyGram, Moneypak, Green Dot, and Vanilla Reload, check or money order purchase receipts, account statements – both foreign and domestic, and any other records reflecting the receipt, deposit, or transfer of money;

4.      United States currency, foreign currency, financial instruments, negotiable instruments, jewelry, precious metals, stocks, bonds, money wrappers, and receipts or documents regarding purchases of real or personal property;

5.      Vehicle rental agreements and receipts, storage facility rental agreements, records of mail services, airline ticket receipts, bus ticket receipts, credit card receipt, hotel receipts, travel agency vouchers, long distance telephone call records, and any other items reflecting domestic and foreign travel;

6.  Safe deposit box keys, storage locker keys, safes, and related secure storage devices, and documents relating to the rental or ownership of such units;

7.  Indicia of occupancy, residency, rental, ownership, or use of the Subject Premises and any vehicles found thereon during the execution of the warrant, including, utility and telephone bills, canceled envelopes, rental, purchase or lease agreements, identification documents, keys, records of real estate transactions, vehicle titles and registration, and vehicle maintenance records;

8.  Photographs, including still photos, negatives, slides, videotapes, and films, in particular those showing co-conspirators, criminal associates, U.S. currency, smuggled aliens, real and personal property, firearms, or controlled substances;

9.  Firearms, ammunition, magazines, cases, boxes, holsters, slings, gun pieces, gun cleaning items or kits, ammunition belts, original box packaging, targets, expended pieces of lead, and records, receipts, or other paperwork showing the purchase, storage, disposition, or dominion and control over firearms and ammunition.

10.  Electronic equipment, including cellular telephones, computers, disks, thumb drives, and any media storage device, GPS devices and their memory, and related manuals used to generate, transfer, count, record or store the information described in this attachment.

11.  Records evidencing ownership or use of cellular telephones, including sales receipts, pre-paid minute cards, registration records, and records for payment for internet access.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Matthew M. Taynton, a Border Patrol Agent- Intelligence of the United States Border Patrol, being duly sworn, does depose and state the following:

## I.      INTRODUCTION AND AGENT BACKGROUND

1.      Your Affiant makes this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises located at 4665 E County 12TH ST, Yuma, Arizona 85365 (32.65275, -114.55144) (hereinafter "**Subject Premises**"), as further described in Attachment A, in order to search for and seize the items outlined in Attachment B, which represent evidence, fruits, and/or instrumentalities of the criminal violations further described below.

2.      I am a United States Border Patrol Agent-Intelligence (BPA-I) and have been employed with the United States Border Patrol (USBP) since January 2017. As a Border Patrol Agent, your Affiant is responsible for investigating violations of laws enumerated in Title 8, Title 18, of the United States Code, and Title 21 of the Code of Federal Regulation. Included in my responsibilities is the investigation of illegal alien smuggling across the United States border. In preparing to become a Border Patrol Agent, your Affiant attended the U.S. Border Patrol Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico.

3.      Your Affiant is currently assigned to the Yuma Sector Intelligence Unit, Yuma Sector Special Operations Detachment. Your Affiant is currently a law enforcement officer of the United States and is empowered by law to conduct investigations, make arrests, and execute search warrants. Your Affiant is familiar with, and has participated in, several traditional methods of investigation, including but not limited to; visual surveillance, questioning of witnesses, and the participation of search and arrest warrants. Your Affiant has also spoken with numerous individuals who have been involved in various aspects of alien smuggling, including recruitment, planning/conspiring, transportation, and concealment of illegal aliens, as well as the collection, transportation,

and repatriation of alien smuggling proceeds, and from doing so, has learned techniques commonly used by those involved in alien smuggling.

4.     The statements contained in the Affidavit are based on information from your Affiant's personal knowledge, training, and experience; information obtained from the knowledge and observations of other sworn law enforcement officers, either directly or indirectly through their reports or affidavits; surveillance conducted by law enforcement officers; and analysis of public records.

5.     Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, your Affiant has not set forth all of the relevant facts known to law enforcement officers.

## II.     PROBABLE CAUSE

6.     This case is part of a law enforcement intelligence-driven, target enforcement operation planned to disrupt the operations of the Transnational Criminal Organizations (TCOs), which are utilizing the Sonoran Desert, Barry M. Goldwater Air Force Range, local state highways, and local housing districts to facilitate the movement of narcotics and Undocumented Noncitizens (UNC) into the United States. This is a joint operation consisting of the Yuma Sector (YUM) Special Operations Detachment (SOD), YUM Sector Intelligence Unit (SIU), YUM Small Unmanned Aircraft Systems (SUAS), Yuma Station (YUS) Mobile Response Team (MRT), and air support from an Arizona Air Guard unit with a Border Patrol Agent on board. (LAKOTA) YUM SOD is comprised of the Border Patrol Tactical Unit (BORTAC) and the YUM Border Patrol Search Trauma and Rescue (BORSTAR) teams which are trained and equipped to perform high-risk tactical and search and rescue missions. YUM SOD conducted reconnaissance the week prior to the planned operation. YUM SOD was able to confirm the tactics, techniques, and procedures (TTPs) used by the TCOs to facilitate the movement of people into the United States. The TTPs observed were various routes through the Sonoran Desert, Barry M. Goldwater Air Force Range, as well as the apprehension and arrest of Undocumented

Noncitizens (UNC) that were staged for pick-up near State Route 195 (SR-195) and the Fortuna Foothills housing districts. Groups apprehended were utilizing foam carpet shoe covers to help cover their footprints while walking; making it harder for patrolling agents to detect the tracks.

7.      On January 22, 2023, at approximately 1735 hours, YUM SOD operators were advised by YUS agents that they had detected an illegal entry into the United States consisting of five subjects and were actively surveilling them using a Mobile Surveillance Capability Truck (MSC). At approximately 1930 hours, YUM SOD operators, located at an established Listening and Observation Post (LPOP), observed the five subjects walking through the Hazard Area of the Barry M. Goldwater Air Force Range.[1] At approximately 2254 hours, LAKOTA was able to gain visual of the group and continued surveilling the group of five subjects located near the Fortuna Foothills housing district.[2] At approximately 2338 hours, LAKOTA observed all five subjects load into a red in color, Toyota Camry bearing Arizona license plate #BWC6450. LAKOTA and YUM SIU were able to surveille the vehicle leaving the Fortuna Foothills housing district and drive towards the eastern Yuma city limits. On January 23, 2023, at approximately 0001 hours, the vehicle ultimately stopped in the driveway of 4665 E County 12TH ST, Yuma, Arizona

[1] The Barry M. Goldwater Air Force Range (BMGR) has restricted access to the public for this remote part of the desert. The Marine Corps Air Station – Yuma (MCAS) controls the western portion of this range and for authorization to enter this restricted area, Border Patrol Agents must first contact MCAS Range Control for permission. If the ranges are being utilized by the military, agents are not permitted to enter or patrol these areas, even if they have probable cause of an illegal entry. With the ranges in use, TCOs are able to exploit this restricted patrolling access to evade law enforcement while they smuggle narcotics and people into the country.

[2] TCOs will utilize the Fortuna/Foothills housing areas as pick-up locations, ranging from Avenue 7E to the Gila Mountains. Although groups using routes directed towards the Fortuna/Foothills housing area may have to travel longer distances, they are able to use the Barry M. Goldwater Air Force ranges, Gila Mountains, and many deep washes in their favor in order to prevent detection and apprehension. Based on their training and experience, BPAs know it is a tactic that is used by smugglers to walk their groups close to the base of the Gila Mountains to ensure an easier evasion if they are detected by agents. The rocky terrain makes it difficult for agents to follow footprints left behind by the smugglers. The washes used are often filled with thick brush and leaves agents with only a few off trails to access the area. The washes are also deep enough to provide concealment from agents who are doing high visibility searches. One primary wash used by the smugglers is the Fortuna Wash. The Fortuna wash begins in the Gila Mountains around the Fortuna Mine, goes through the middle of the Foothills housing area, and ends around United States Highway 95. The Fortuna/Foothills housing areas allow the pick-up vehicle drivers to blend in with the local traffic and use the streets for staging points. This allows for a fast load up and the ability to blend in with local civilian traffic.

85365 (32.65275, -114.55144), the **Subject Premises**. A subject exited the vehicle and went inside of the **Subject Premises**. At approximately 0003 hours, a subject exited the residence, entered the vehicle, and drove the vehicle into the garage. LAKOTA was able to observe all five subjects exit vehicle and walk towards the residence from the inside of the garage before losing sight. LAKOTA and YUM SIU maintained constant surveillance at **Subject Premises**. At approximately 0004 hours, the vehicle left the residence and traveled west on East County 12 road where YUS MRT agent conducted a traffic stop. The driver was the only occupant of the vehicle; confirming the five subjects were still at the residence. At approximately 0030 hours, YUM SOD and YUM SIU conducted a knock and talk identifying themselves as Border Patrol agents at **Subject Premises**. One of the caregivers and renters of the residence, later identified as Rose Lynn LARA CRUZ, answered the door and provided consent to search **Subject Premises**. A second caregiver was later identified as James William POSTON. YUM SOD and YUM SIU were able to identify 10 UNCs inside **Subject Premises**. All 10 UNCs and both caregivers were taken into custody.

8.     This operation led agents to a residence located at 4665 E County 12TH ST, Yuma, Arizona 85365 (32.65275, -114.55144), the **Subject Premises**. YUM SIU and YUM SOD are actively and currently maintaining constant visual on **Subject Premises**.

9.     Agents suspect that the events detailed above illustrate that the **Subject Premises** is being used as a harboring or stash location to hold UNCs until they are transported further into the United States to their final destinations.

10.     Agents suspect the **Subject Premises** will contain evidence in the form of ledgers, documents, monetary instruments, and digital devices of evidentiary value to the investigation. Investigators suspect that evidence will aid in developing charges against known and unknown conspirers of the smuggling organization and additional co-conspirators.

## III.   ITEMS TO BE SEIZED

11.     Based upon the facts contained in this Affidavit, your Affiant submits there is probable cause to believe that the items listed in **Attachment B** will be found at the **Subject Premises**.

12.     Based on my training, education, and experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, your Affiant knows the following:

    a.     That human smugglers keep records of smuggling transactions and activities within their residences or within ready access, such as in offices or storage areas, and conceal such items from law enforcement authorities; also, that aliens may be moved and transported, but documentary records and ledgers remain;

    b.     That human smugglers maintain various amounts of currency in their residences in order to finance their ongoing illegal activities and other businesses, as well as using the currency to pay transporters, bills, acquire assets and make purchases;

    c.     That it is common knowledge that human smuggling transaction records, customer lists, financial statements, real estate documents and other evidence of financial transactions relating to obtaining, transferring, secreting or spending various sums of money made from engaging in human smuggling activities are often contained at persons' residences;

    d.     That human smugglers often amass large proceeds and have bank accounts, records and receipts, vehicle rental agreements for storage facilities, records of mail services, and that such items are secured within their residences or storage areas for easy access;

    e.     That human smugglers engage in interstate and foreign travel to transport UNCs and their smuggling proceeds. Evidence of such travel is often maintained in the form of airline ticket receipts, vehicle rental receipts, credit card receipts, hotel receipts, travel agency vouchers, records of long distance telephone calls and other items reflecting domestic and foreign travel;

f.      That human smugglers and their associates who smuggle UNCs into the United States will have maps showing smuggling routes, foreign fuel receipts, receipts showing travels to source countries, receipts pertaining to the purchase and registration of load vehicles, receipts showing modifications and repairs of vehicles, receipts showing the purchase of items commonly used by smugglers such as portable radios, cellular phones, pagers, firearms and other equipment used for transporting large numbers of UNCs. These individuals will also possess these purchased items at their residences or storage lockers;

g.      That human smugglers and their associates who smuggle UNCs into the United States use cellular telephones to further their smuggling operation to include arrangement of pickups, drop-offs, coordination of load drivers and payment of smuggling fees.

h.      That individuals in or about the premises to be searched often attempt to conceal property subject to seizure on their persons, in attached and unattached buildings and shelters, and vehicles on the premises; and

i.      That human smugglers display and use loaded firearms for security during smuggling operations to safeguard, maintain and control their illegal smuggling activities.

13.      In addition to items which may constitute evidence, fruits and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the **Subject Premises**, including rent receipts, utility bills, telephone bills, addressed mail, personal identification, keys, purchase receipts, sale receipts, photographs, vehicle pink slips, and vehicle registration.

## IV.    DIGITAL EVIDENCE STORED WITHIN ELECTRONIC STORAGE MEDIA

14.      As described in Attachment B, this application seeks permission to search for records that might be found in or on the **Subject Premises**, in whatever form they are

found, including data stored on a computer, cellular telephone, tablet, or other media storage device, such as a thumb drive, CD-ROM, DVD, Blu Ray disk, memory card, or SIM card (hereafter collectively referred to as "electronic storage media"). Thus, the warrant applied for would authorize the seizure of all electronic storage media found in or on the **Subject Premises** and, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

15.    *Probable cause.* Your Affiant submits that if electronic storage media are found in or on the **Subject Premises**, there is probable cause to believe records and information relevant to the criminal violations set forth in this Affidavit will be stored on such media, for at least the following reasons:

a.    Your Affiant knows that when an individual uses certain electronic storage media, the electronic storage media may serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic storage media is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic storage media is also likely to be a storage medium for evidence of crime. From my training and experience, your Affiant believes that electronic storage media used to commit a crime of this type may contain: data that is evidence of how the electronic storage media was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

b.    Based on my knowledge, training, and experience, your Affiant knows that electronic storage media contain electronically stored data, including, but not limited to, records related to communications made to or from the electronic storage media, such as the associated telephone numbers or account identifiers, the dates and times of the communications, and the content of stored text messages, e-mails, and other communications; names and telephone numbers stored in electronic "address books;" photographs, videos, and audio files; stored dates, appointments, and other information on

personal calendars; notes, documents, or text files; information that has been accessed and downloaded from the Internet; and global positioning system ("GPS") information.

      c.     Based on my knowledge, training, and experience, your Affiant knows that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on an electronic storage medium, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

      d.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the electronic storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      e.     As previously set forth in this Affidavit and based on your Affiant's training and experience, the targets of this investigation will have to communicate telephonically or through the use of communications applications on their mobile devices or other computer equipment to coordinate with smuggling coordinators in Mexico, guides that lead the UNCs through the desert to their pickup locations, stash house coordinators, and other drivers involved in the smuggling operations. The communication over these devices will be instrumental in facilitating this criminal activity. Therefore, your Affiant believes that evidence of criminal activity will be found on any electronic storage media found at the **Subject Premises** and that the electronic storage media constitute instrumentalities of the criminal activity.

      16.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of

the crimes described on the warrant, but also for forensic electronic evidence that establishes how the electronic storage media were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be found on any electronic storage media located in or on the **Subject Premises** because:

        a.      Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. File systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

        b.      As explained herein, information stored within electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within electronic storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while

executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the owner. Further, activity on an electronic storage medium can indicate how and when the storage medium was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on an electronic storage medium may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the existence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera) not previously identified. The geographic and timeline information described herein may either inculpate or exculpate the user of the electronic storage medium. Last, information stored within an electronic storage medium may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within a computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on an electronic storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, electronic storage medium evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on one electronic storage medium is evidence may depend on other information stored on that or other storage media and the application of knowledge about how electronic storage media behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how an electronic storage medium was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

17.   *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on electronic storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.  *The time required for an examination.* As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine electronic storage media to obtain evidence. Electronic storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  *Technical requirements.* Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the electronic storage media off-site and reviewing it in a controlled environment allows for a thorough examination with the proper tools and knowledge.

c.  *Variety of forms of electronic media.* Records sought under this warrant could be stored in a variety of electronic storage media formats that may require off-site reviewing with specialized forensic tools.

18.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit seizing, imaging, or otherwise copying electronic storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might

expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

V.     **CONCLUSION**

19.     Your Affiant submits there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and/or instrumentalities of violations of Title 8, United States Code, Section 1324(a)(1)(A)(iii) -- Harboring Certain Aliens are likely to be found at the **Subject Premises** which is further described in Attachment A.

Matthew M. Taynton
Border Patrol Agent – Intelligence

Sworn to telephonically this 23rd day of January, 2023.

HONORABLE JAMES F. METCALF
United States Magistrate Judge